**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
DEREK IACCARINO,               )
                               )
            Plaintiff          )
                               )
        v.                     )  Civil Action No. 17-0857(EGS)
                               )
ELAINE DUKE, Acting Secretary, )
U.S. Department of Homeland    )
Security, et al.,              )
                               )
            Defendants.        )
_____)
```

## MEMORANDUM OPINION

Plaintiff Derek Iaccarino, a former Federal Protective
Service employee, brings this action against Elaine Duke, Acting
Secretary of the Department of Homeland Security ("DHS"), and
two employees of the Federal Law Enforcement Training Center
("FLETC") under the Administrative Procedure Act, 5 U.S.C. §
701, *et seq*. Mr. Iaccarino challenges FLETC's finding that he
engaged in misconduct and its decision to expel him after Mr.
Iaccarino was arrested by FLETC security guards for failure to
produce his identification. He seeks, *inter alia*, vacatur of
that decision and remand to DHS for a new final agency decision
consistent with a less severe punishment. Compl., ECF No. 1 ¶¶
62-63. The parties have filed cross-motions for summary judgment
and this matter is ripe for decision. *See* Defs.' Mot. Summ. J.
("Defs.' Mot."), ECF No. 18; Pl.'s Cross-Mot. ECF No. 19. The

Court finds that although DHS adequately explained its finding of Mr. Iaccarino's misconduct, it failed to explain why expulsion was the appropriate sanction for that misconduct. The Court therefore **GRANTS IN PART** and **DENIES IN PART** both Mr. Iaccarino's and the defendants' Cross-Motions for Summary Judgment. Further, the Court **REMANDS** the matter to DHS for further proceedings consistent with this Memorandum Opinion.

## I. Background

This dispute arises out of an altercation that occurred while Mr. Iaccarino was a trainee at FLETC's Physical Security Training Program ("training program"). Compl., ECF No. 1 ¶ 13. At that time, Mr. Iaccarino was employed as a Law Enforcement Specialist within the Federal Protective Service of the National Protection and Programs Directorate, Department of Homeland Security ("DHS") and enrolled in the training program at FLETC as part of his employment. *Id.* ¶¶ 7, 13. The training program ran from July 2016 through January 31, 2017. *Id.* ¶ 13. Mr. Iaccarino was scheduled to graduate from the training program on January 31, 2017, but, ten days earlier, he was involved in an incident with other students and several security guards. *Id.* ¶¶ 15–16, 47–48. On graduation day, Mr. Iaccarino was informed he was permanently expelled from FLETC; effectively ending his career in federal law enforcement. *Id.* ¶ 48

## A. The Incident

In the early morning hours of January 21, 2017, Mr. Iaccarino, and three other trainees, Heather Chaney, Carlos Castillo, and Joshua Wood, were on the balcony of one of FLETC's buildings drinking, smoking cigarettes, and listening to music playing from a nearby room. Administrative Record ("AR") at 57.[1] The group caught the attention of Officer Michael Jordan who was on patrol nearby. AR at 57–58. Officer Jordan approached the group and informed them that they would need to return to their rooms before someone filed a noise complaint. AR at 58. The four refused. *Id.* One of the males in the group (it is unclear who), stated, "we have been here for seven months and we will do what we want." *Id.* Officer Jordan again asked the group to return to their rooms; and, again, they refused. *Id.* Officer Jordan left and advised the group that if he had to come back via a complaint he would need to take their names and report the incident to their class coordinator. *Id.*

Approximately 30 minutes later, Officer Jordan received a noise complaint and was dispatched back to the building. AR at 59. Upon arriving, Officer Jordan saw Officers Shelton Fuller and Mark Ruis approaching the same group he spoke to earlier.

---

[1] The certified administrative record in this matter was submitted on May 31, 2018 and is docketed at ECF No. 25. When citing the AR throughout this opinion, the Court cites to the ECF header page number.

*Id.* Officer Jordan overheard Mr. Iaccarino say "this is a waste of my time for the same old mother-f*ing sh*t." *Id.* The Officers repeatedly requested the trainees to produce their identifications; and all four students continued to refuse. AR at 62. Mr. Wood "began getting loud" with Officer Fuller while refusing to hand over his identification, to the point where the other trainees began telling him to calm down. *Id.* After several attempts by the Officers to get the identifications for the report, the Officers called the shift supervisor, Lieutenant James Wiley. AR at 63.

The saga continued when Lt. Wiley arrived. Lt. Wiley repeatedly asked for the trainees' identifications, and the trainees refused and continued to drink. AR at 60. Mr. Wood stated he "did not have to give up his f*ing ID card" and then walked away saying "this is bullsh*t." AR at 67. Ms. Chaney responded by using her phone to film Lt. Wiley; and by stating he did not have the authority to request her identification. *Id.* Iaccarino was "very argumentative" and told the other trainees the officers had no authority and "could not do sh*t;" continued to use profanity and began recording Lt. Wiley on his phone. *Id.* Mr. Castillo stated he would not comply because he did nothing wrong. AR at 68. At a stalemate, Lt. Wiley contacted Christopher Meidt, the Security and Emergency Management Specialist (SEM), for assistance. *Id.*

4

During the wait for SEM Meidt, Mr. Castillo had an unpleasant conversation with Officer Ruis. AR at 63–64. Mr. Castillo approached Officer Ruis and stated, "Hey, 'mustache' . . . you're thinking your life sucks right now. . . . 'Mustache,' you're gonna welcome me back to FLETC every day at the gate, you're gonna say . . . 'welcome to FLETC, Sir' I'm gonna get you fired for this, I hate you. I hate you, I've got more experience than you. I know I do!" AR at 63. Mr. Castillo followed up this monologue with an "aggressive look by furrowing his eyebrows intensely." AR at 64. Officer Ruis maintained his composure and the situation did not escalate. *Id.* Ms. Chaney then "finally said okay," and provided her identification to Officer Fuller and left. AR at 71. SEM Meidt arrived shortly thereafter. AR at 64.

By all accounts, Mr. Iaccarino and SEM Meidt did not get along. *See, e.g.*, AR at 49. Mr. Iaccarino "confronted SEM Meidt immediately" and wanted to know why he needed to produce his identification. AR at 50. After SEM Meidt explained who he was and asked for the trainees' identifications, Mr. Iaccarino "blatantly refused," AR at 68, was "very belligerent," AR at 49, and began filming SEM Meidt, AR at 68. Mr. Iaccarino stopped filming when instructed to do so by the Officers, but continued to argue about producing his identification. AR at 64, 68. SEM Meidt instructed Mr. Iaccarino that he would be detained if he

did not produce his identification. AR at 50. Mr. Iaccarino did not comply and was put in handcuffs. *Id.* Once in handcuffs, Mr. Iaccarino dropped his identification card to his feet. AR at 60. Messrs. Castillo and Wood provided their identifications soon after. AR at 50. All three were transported to another FLETC building, Building 93, for further investigation. AR at 64–65.

The group arrived at Building 93; Ms. Chaney joined them shortly of her own volition. AR at 71. Mr. Castillo continued to verbalize his distaste for Officer Ruis and his goal to get him fired. AR at 65. Mr. Iaccarino was compliant with all orders from that point on. AR at 64. The local police were contacted, and two trainees submitted to breathalyzer tests: Mr. Wood's results showed a blood-alcohol content of .061 and Mr. Iaccarino's results showed a blood-alcohol content of .108. AR at 60–61. Ms. Chaney and Mr. Castillo refused the test. *Id.* The trainees were separated and ultimately provided witness statements. AR at 68. After providing the statements, they were free to leave, but told that there would be an investigation into the incident. AR at 50.

## B. The Investigation/Inquiry Procedure

Because many of the issues in this case relate to the procedures required whenever FLETC conducts an investigation or inquiry into alleged misconduct, a brief summary of those

procedures is provided before addressing the investigation conducted into the circumstances of the January 21 incident.

FLETC's Student Misconduct Manual ("misconduct manual") "establishes procedures for inquiries and investigations of student . . . misconduct as well as procedures for imposing discipline on students who commit . . . misconduct while in training status." AR at 83. The misconduct manual defines two types of investigatory procedures into misconduct. The first is an "inquiry," defined as an "administrative fact-finding procedure. . . . used to determine the facts when a student is alleged to have committed an infraction[] and/or misconduct but is not suspected of committing criminal activity or organized misconduct." AR at 85. The second, an "investigation," is also a "fact-finding procedure" but is "used whenever a student is suspected of having committed a criminal act or misconduct." *Id.* An investigation, as opposed to an inquiry, begins when "[a]lleged incidents of criminal acts or serious misconduct . . . [are] referred to the [Office of Professional Responsibility ("OPR")]." AR at 90. If OPR chooses not to investigate the allegations, it returns the investigation to the Training Management Division ("TMD"), Division Chief of the training program for further inquiry. *Id.* The standard of evidence to show misconduct occurred is proof by preponderance of the evidence. AR at 96.

The misconduct manual sets the minimum requirements for the manner in which an inquiry or investigation is conducted. AR at 91–95. "When conducting an inquiry or an investigation, at minimum, the [investigative officer] shall" notify the student and "allow the student an opportunity to address the allegations and to submit relevant rebuttal material." AR at 91. The investigative officer is required to "summarize the subject student interview in a [memorandum of investigation]," which the investigative officer is required to provide to the "witness for review and signature." *Id.* The TMD Chief is required to review the investigative file and "prepare an action memorandum to the appropriate Discipline Approval Authority"[2] ("DAA") recommending a particular punishment. *Id.*

When reviewing the investigative file, the DAA, "at a minimum, . . . shall utilize" certain factors "to determine what, if any, discipline is appropriate." AR at 94. The factors include:

(a) The seriousness of the alleged misconduct;

(b) The likelihood of the recurrence of the alleged misconduct;

(c) The likelihood that the presence of the student will have a disruptive or undesirable effect on the class and/or upon the training environment if the student remains in training;

---

[2] The misconduct manual states the Discipline Approval Authority is the "Site Director at the Field Training Directorate . . . and the Deputy Assistant Director ("DAD")." AR at 84.

(d) The likelihood that the student will [or] will not repeat the alleged misconduct;

(e) The student's record prior to the alleged misconduct;

(f) The student's response to the allegations of misconduct;

(g) Whether the student made any admission of responsibility, regret, and/or remorse;

(h) The type of discipline recommended by the [investigative officer] and the TMD Chief;

(i) Any other relevant information.

AR at 94. Upon consideration of these factors, the DAA has the option of approving, modifying, or denying the action recommended by the TMD Chief. *Id.* If the DAA chooses to remove or expel a student, then the student has a right to appeal. AR at 95.

The misconduct manual outlines the procedure for such an appeal. AR at 95–96. The Enterprise Program Manager ("EPM") reviews expulsion appeals.[3] AR at 95. The student has the option of presenting an appeal either orally, by writing, or both. *Id.* The EPM is required to review the disciplinary file and any new materials including information provided by the student in writing or during the oral appeal. *Id.*

---

[3] According to the misconduct manual, the EPM is the Assistant Director of the Centralized Training Management Directorate. AR at 84.

The misconduct manual lays out a two-step process for the EPM's ultimate resolution of the appeal. AR at 96. After review of the information submitted, the EPM "shall first determine, based on any new evidence whether the infraction(s) and/or misconduct occurred." *Id.* "The standard of review during an appeal remains proof by preponderance of the evidence." *Id.* If it is determined that the alleged misconduct occurred, the EPM next "shall determine whether the discipline imposed was appropriate." *Id.* If the EPM decides to "uphold [the] removal or expulsion, the EPM shall set forth the reasons why this punishment was appropriate." *Id.* The EPM must also "issue a letter to the student containing all findings and decisions." *Id.* The EPM's decision on appeal constitutes a final agency action. *Id.*

## C. The Inquiry

Pursuant to the procedures set forth in the misconduct manual, on January 24, 2017, Senior Advisor Steve Bialousz contacted OPR and requested that it open an investigation into the events of the morning of January 21. AR at 26. OPR informed Senior Advisor Bialousz that the matter was "primarily administrative in nature" and that OPR "would not open an official investigation." *Id.* OPR referred the case back to FLETC, and Senior Advisor Bialousz assigned the case to Program

Specialist ("PS") Edward King to conduct an inquiry into the incident. *Id.*

That same day, PS King recommended that the training program expel Mr. Iaccarino. *Id.* PS King found that Mr. Iaccarino engaged in misconduct "specifically by blatantly refusing to follow lawful instructions, disrespecting FLETC security officers, . . . using inappropriate and offensive language when addressed by security, demonstrating a lack of respect and professionalism for fellow law enforcement officers, [and] demonstrating threatening behaviors." *Id.* PS King also found that Mr. Iaccarino ". . . repeatedly call[ed] an officer a derogatory name, . . . and threaten[ed] to have the officer fired." *Id.*

PS King presented this recommendation to the TMD Chief, who in turn presented the same findings to the Deputy Assistant Director. AR at 17, 24. Mr. Iaccarino received notice of his expulsion on January 31, 2017. AR at 21–23. He would later find out that Mr. Castillo was also expelled, but that Mr. Wood and Ms. Chaney were not.[4] Mr. Iaccarino timely appealed his expulsion to the EPM. AR at 15–16.

_____

[4] Mr. Castillo original joined Mr. Iaccarino in this lawsuit challenging his expulsion, but subsequently dropped his appearance. Compl., ECF No. 1 ¶ 53. Ms. Chaney was initially expelled, but she successfully appealed, and her expulsion was reversed. *Id.* ¶54. Mr. Wood was not expelled. *Id.* ¶ 55.

After considering Mr. Iaccarino's oral and written statements, the EPM affirmed Mr. Iaccarino's expulsion. AR at 1. The EPM found that, based on all the information provided, "the alleged misconduct occurred[,] and the discipline imposed—expulsion--was appropriate." *Id.* The entirety of the EPM's explanation is as follows:

> I am satisfied that the allegations of your misconduct have been substantiated by a preponderance of evidence. The facts I found persuasive in reaching this determination are: your failure to comply with repeated FLETC Security personnel demands to produce your identification. You finally produced your identification after FLETC Security placed you in handcuffs. In your oral response, you disputed that you displayed aggressive behavior towards FLETC [S]ecurity personnel and looked to resolve the situation earlier and did not refuse to produce your identification when asked. I do not find these arguments you raised to be persuasive or compelling.

*Id.* The EPM next advised Mr. Iaccarino of his right to judicial review under the Administrative Procedure Act ("APA"). *Id.*

Mr. Iaccarino sought judicial review of his expulsion under the APA, 5 U.S.C. § 701, *et seq.*, by filing this complaint on May 9, 2017. Compl., ECF. No. 1 ¶ 1. He seeks vacatur of the expulsion and a remand back to DHS to issue a new final agency decision. *Id.* ¶ 63. The defendants moved for summary judgment and Mr. Iaccarino filed an opposition and cross-motion for

summary judgment. Defs.' Mot., ECF No. 18; Pl.'s Cross-Mot. ECF No. 19. The motions are now ripe for decision.

## II. Legal Standard

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *see Celotex Corp.*, 477 U.S. at 324.

When reviewing agency action pursuant to the APA, the Court must determine whether the challenged decision is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of

procedure required by law," *id.* § 706(2)(D). The arbitrary or
capricious provision, under subsection 706(2)(A), "is a
catchall, picking up administrative misconduct not covered by
the other more specific paragraphs" of the APA. *Ass'n of Data
Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve
Sys.* (ADPSO), 745 F.2d 677, 683 (D.C. Cir. 1984). The "scope of
review under the 'arbitrary and capricious' standard is narrow
and a court is not to substitute its judgment for that of the
agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm
Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Although this scope of review is deferential, "courts
retain a role, and an important one, in ensuring that agencies
have engaged in reasoned decision making." *Judulang v. Holder*,
565 U.S. 42, 53 (2011). In evaluating agency actions under the
arbitrary and capricious standard, the court must be satisfied
that the agency has "examine[d] the relevant data and
articulate[d] a satisfactory explanation for its action
including a rational connection between the facts found and the
choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C.
Cir. 2006) (internal citation and quotation marks omitted).
Moreover, when an agency "has failed to provide a reasoned
explanation, or where the record belies the agency's conclusion,
[the court] must undo its action." *Cnty. of Los Angeles v.
Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999)(citation and

internal quotation marks omitted). In other words, "the agency must explain why it decided to act as it did." *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

## III. Discussion

As the parties both note, in reviewing the agency's decision the Court is not free "to substitute its judgment for that of the agency." *See State Farm*, 463 U.S. at 43 (1983). Deference must be given to the agency, even when reasonable minds could differ about the correct conclusion. *See Calloway v. Harvey*, 590 F. Supp. 2d 29, 35 (D.D.C. 2008). Under this deferential review, the question for this Court is whether the evidence in the record is sufficient to support the defendants' decision and establish "a rational connection between the facts found and the choice made." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 249 (D.C. Cir. 2013).

Mr. Iaccarino makes three principal arguments as to why DHS's decision to expel him from the training program cannot stand: (1) DHS's decision to give him a harsher punishment than other trainees who acted in the same manner was arbitrary and capricious, Pl.s' Cross-Mot., ECF No. 19-1 at 16–17; (2) DHS's conclusion that he engaged in misconduct was not supported by the record, *id.* at 14–16; and (3) DHS failed to provide a reasoned explanation for why expulsion was the appropriate

punishment in his case. *Id.* at 17–19. This Court addresses each issue in turn.

## A. Disparate treatment

Mr. Iaccarino argues that his behavior was "nearly identical" to that of Mr. Wood and that, because Mr. Wood only received probation, the agency acted in an arbitrary and capricious manner when it failed to explain why it imposed a different punishment for the same behavior. Pl.'s Cross-Mot., ECF No. 19-1 at 16–17. The defendants argue that Mr. Iaccarino received a different punishment because his actions were different, and therefore the agency's decision was not arbitrary and capricious. Defs.' Reply, ECF No. 21 at 7–8.

The Court of Appeals for the District of Columbia Circuit's (D.C. Circuit) "long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." *Kort v. Burwell*, 209 F. Supp. 3d 98, 112 (D.D.C. 2016) (quoting *Cnty. of Los Angeles v. Shalala,* 192 F.3d 1005, 1022 (D.C. Cir. 1999)); *see also Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) ("It is axiomatic that '[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.'") (citation omitted).

In determining whether an agency's action is arbitrary and capricious in treating like cases differently, the court first

determines whether the agency treated "similarly situated" parties in a different manner. *See Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 6-7 (D.C. Cir. 2009) (declining to review whether the Department of Health and Human Services allegedly acted arbitrarily by applying different standards for similar hospitals when appellee failed to show the hospitals were indeed similarly situated). If the parties are similarly situated, then the court next determines whether the agency adequately explained why it failed to treat the cases in a similar manner. *Kort*, 209 F. Supp. 3d at 117 (holding agency's action was arbitrary and capricious when it failed to explain why it denied Medicare coverage for a certain diagnostic scan while approving coverage for another, similarly situated, diagnostic test).

The administrative record shows that Mr. Iaccarino and Mr. Wood were not similarly situated because their actions were materially different.[5] There are some similarities between Mr. Iaccarino's and Mr. Wood's actions in that each initially refused to show their identification, AR at 60, and, at times, used inappropriate language with officers. AR at 67. However,

_____

[5] Mr. Iaccarino also argues that his behavior was identical to Ms. Chaney, whose expulsion was lowered to disciplinary probation. Pl.s' Cross-Mot., ECF No. 19-1 at 16. Ms. Chaney was the first trainee to surrender her identification, and she went back to her room before SEM Meidt arrived. AR 71. She was never placed under arrest and voluntarily reported to Building 93 for further investigation. *Id.* The record clearly shows that Mr. Iaccarino and Ms. Chaney were not similarly situated.

the similarities end there. The record shows that Mr. Wood provided his identification to the Officers without being handcuffed, whereas Mr. Iaccarino was arrested before providing his identification. AR at 50. The record also shows that, although Mr. Wood was at times uncooperative, he was described as "respectful." AR at 58. In contrast, Mr. Iaccarino is described as the "most heavily intoxicated" and the "most vocal," AR at 50, and in multiple reports described as "belligerent," AR at 18, 49. Because the record shows that there were material differences between Mr. Wood's and Mr. Iaccarino's actions, and therefore they were not "similarly situated," DHS did not act arbitrary and capriciously by imposing different punishments.[6] *See Anna Jaques Hosp.*, 583 F.3d at 6–7.

**B. DHS's decision that Mr. Iaccarino engaged in misconduct**

Mr. Iaccarino next argues that the evidence in the record did not support DHS's conclusion that he engaged in misconduct. Pl.s' Cross-Mot., ECF No. 19-1 at 14–16. He contends that the administrative record does not contain factual support for many

---

[6] Mr. Iaccarino references another trainee who at some point was disciplined for drinking at a FLETC event, but was not expelled. Pl.s' Cross-Mot., ECF No. 19-1 at 17. According to Mr. Iaccarino, the other trainee was "drinking at a FLETC event" and "creating a security incident that took . . . security officers one hour to resolve." *Id.* (citing AR at 11). Those are simply inadequate facts to determine that the circumstances of Mr. Iaccarino and this unnamed trainee were sufficiently alike such that the agency erred in not explaining why it treated Mr. Iaccarino's case differently.

of the findings upon which his expulsion was based. *Id.* Specifically, Mr. Iaccarino takes issue with the findings in PS King's report as not supported by the record. *Id.* at 14–15. Since the findings have no basis in the record, Mr. Iaccarino argues, the final agency decision upholding his appeal which relied on those findings could not have been supported by substantial evidence. *Id.*

Defendants contend that the decision was supported by sufficient evidence. First, defendants argue that it is undisputed that FLETC had the authority to expel Mr. Iaccarino. Defs.' Mot., ECF No. 18-1 at 13. Next, the defendants argue that the record in this case is "replete with evidence supporting Iaccarino's expulsion." *Id.* at 14–15. The defendants point to various statements made by the Officers who responded to the noise violation describing Mr. Iaccarino's behavior as uncooperative, and reports which show that Mr. Iaccarino violated the noise and identification policies. *Id.* With respect to its explanation for the expulsion, defendants point to PS King's report to the TMD Chief as sufficient. *Id.* at 16. Defendants argue that the report "provided a detailed description of the findings of fact made during FLETC's investigation . . . [and] that this misconduct violated four separate FLETC student misconduct provisions." *Id.* (citing AR at 24).

When review of an agency's action is "bound up with a record-based factual conclusion," the reviewing court must determine whether that conclusion "is supported by substantial evidence." *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999); *see also Kaufman v. Perez*, 745 F.3d 521, 527 (D.C. Cir. 2014) (noting that agency factual findings may be "set aside . . . only if unsupported by substantial evidence on the record as a whole") (citation and internal quotation marks omitted). "An agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706." *Butte Cnty. Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). As the D.C. Circuit has explained, an agency decision "would be arbitrary and capricious" if it is not "supported by substantial evidence" because "it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense." *ADPSO*, 745 F.2d at 684. "Consequently, when assessing whether agency action is arbitrary or capricious, in their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same." *Id.* at 683.

It is undisputed that PS King's report provided the findings for the agency's determination of misconduct. *See* Defs.' Mot., ECF. No. 18-1 at 16; Pl.s' Cross-Mot., ECF No. 19-1

at 14. Mr. Iaccarino's arguments that the record does not support the agency's findings that he assumed an aggressive posture, was placed in handcuffs because of his aggressive actions, and that he demonstrated threatening behaviors, are easily dismissed. There is sufficient evidence in the record to support these findings: for example, Officer Fuller explicitly stated "Mr. Derek Iaccarino became very belligerent towards Mr. Meidt," AR at 49; and Officer Ruis stated "Derek Iaccarino become so argumentative with Mr. Meidt, at that point, that Mr. Meidt instructed me . . . to place [Mr. Iaccarino] in handcuffs," AR at 64.

That said, the administrative record does not support the other two findings in the report--that Mr. Iaccarino called an officer a derogatory name and threatened to have that officer fired. *See* AR at 26. It is clear from the record that another student referred to Officer Ruis by a derogatory name, "Mustache." AR at 63 ("Hey, Mustache . . . you're thinking your life sucks right now? . . . Mustache, you're gonna welcome me back to FLETC every day at the gate."). And that this same student repeatedly threatened to get Officer Ruis fired. *See, e.g., id.* ("I'm gonna get you fired for this, I hate you."). In Mr. Iaccarino's expulsion letter he was informed that he violated FLETC standards of conduct in part by repeatedly calling officers derogatory names, AR at 21, however, the

administrative record contains no facts to support such a
finding.[7]

Mr. Iaccarino did not contest these deficiencies in the
report; nor in his expulsion letter in his appeal to DHS.
Furthermore, there is no indication that the EPM relied on these
erroneous findings in determining that Mr. Iaccarino engaged in
misconduct. In Mr. Iaccarino's appeal, he brought to the EPM's
attention several discrepancies in the Officers' statements and
"several examples of the lack of quality of evidence." AR at 8–
12. The EPM stated the "matters . . . raised in [Mr.
Iaccarino's] written appeal and oral response" were "carefully
considered." AR at 1. Critically, the EPM did not rely on the
findings related to the derogatory name-calling or threats of
firing an officer in its decision finding that the misconduct
occurred. *Id.* Rather, the EPM relied on two facts in determining
there was misconduct: (1) Mr. Iaccarino "fail[ed] to comply with
repeated FLETC Security personnel demands to produce . . .
identification," and (2) Mr. Iaccarino finally produced his
identification "after FLETC Security placed [him] in handcuffs."
*Id.* The EPM also stated that it did not find persuasive Mr.

---

[7] It is troubling that in several places in the Inquiry Report
Mr. Castillo is referred to as the subject of the misconduct
inquiry--not Mr. Iaccarino. *See, e.g.*, AR at 24 ("This inquiry
was conducted to determine if *Mr. Castillo's actions* were in
violation of the above mentioned FLETC Directive.") (emphasis
added).

Iaccarino's arguments that he was not aggressive towards officers and that he produced his identification when asked. *Id.*

It is these findings that the EPM "found persuasive in reaching" its determination that "the allegations of [Mr. Iaccarino's] misconduct [were] substantiated by a preponderance of evidence." *Id.* Because the findings that Mr. Iaccarino refused to comply with the security officers' requests for his identification and did not produce his identification until he was handcuffed were supported by sufficient evidence in the record, the Court finds that DHS's decision that the alleged misconduct occurred was supported by substantial evidence.

## C. DHS's explanation for Mr. Iaccarino's expulsion

Mr. Iaccarino next argues that DHS's decision to expel him, rather than suspend or terminate him, was arbitrary and capricious for two reasons. First, Mr. Iaccarino argues that DHS relied on facts that did not exist to support its conclusions. Pl.'s Cross-Mot., ECF No. 19-1 at 17–18. Second, Mr. Iaccarino contends that DHS acted in an arbitrary and capricious manner when it failed to consider or explain important relevant factors. *Id.* at 18–19. The defendants argue that Mr. Iaccarino violated a host of FLETC rules and point to the statements of witnesses as support for his expulsion. Defs.' Reply, ECF No. 21 at 4–6. Defendants disagree that DHS failed to consider the

relevant factors because the factors were considered during Mr. Iaccarino's appeal. *Id.* at 9–11.

"The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result." *Public Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993) (citing *Federal Election Comm'n v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986)). It is a fundamental tenet of administrative law that "an agency set forth its reasons for decision; and an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). This fundamental principle "is indispensable to sound judicial review." *Id.* The arbitrary and capricious standard of the APA "mandat[es] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). Put simply, an agency "must explain why it chose to do what it did . . . and conclusory statements will not do." *Amerijet,* 754 F.3d at 1350.

This does not mean that an agency's ultimate conclusion needs to be impeccably reasoned to survive a challenge under the APA. A reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983) (citing *Bowman Transp., Inc. v. Arkansas-Best Motor Freight System*, 419 U.S. 281, 286 (1974)). However, an agency's explanation must, at a minimum, contain "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "When an agency provides a statement of reasons insufficient to permit a court to discern its rationale, or states no reasons at all, the usual remedy is a remand to the agency for additional investigation or explanation." *Tourous Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 738 (D.C. Cir. 2001) (citation and internal quotation marks omitted).

Mr. Iaccarino's first argument is that DHS relied on facts non-existent in the record. However, as explained above, the EPM explicitly relied on facts that were supported by the record in explaining its finding that misconduct occurred. *See Supra* at 22–23. The record also belies Mr. Iaccarino's second argument that DHS never consider several mitigating factors. The record contains Mr. Iaccarino's written submissions for his appeal, which analyzes each of the factors he contends were not considered. AR at 10. The letter notifying Mr. Iaccarino of the result of his appeal references his written submissions, and the submissions were considered in connection to his appeal. AR at

1. The EPM reviewed these factors as part of "the matters [Mr. Iaccarino] raised in his written appeal" which the EPM "carefully considered." *Id.* The APA does not require more. *Crooks v. Mabus*, 104 F. Supp. 3d 86, 102-03 (D.D.C. 2015) (rejecting argument that the agency allegedly did not consider the plaintiff's submissions when the record contained the submissions and the agency referenced the submissions in its final decision).

What the APA does require, however, is an explanation as to why DHS determined that expulsion was an appropriate remedy for Mr. Iaccarino's misconduct. *See Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (stating agency did not adequately explain its decision when it merely listed facts and conclusions without connecting them in a rationale way). Here, after explaining the facts which formed the basis for its finding of misconduct, the agency explained Mr. Iaccarino's right to judicial review. However, DHS "omitted a critical step--connecting the facts to the conclusion" that expulsion was the appropriate sanction in Mr. Iaccarino's case. *See Dickson*, 68 F.3d at 1405.

This omission is even more glaring because FLETC's own rules require such an explanation. As the misconduct manual explains, the EPM must make two determinations when reviewing a decision to expel a trainee. AR at 96. First, the EPM must

determine whether the misconduct was found by a preponderance of the evidence. *Id.* Next, if the EPM finds that the misconduct indeed did occur, the EPM "shall determine whether the discipline imposed was appropriate." *Id.* Moreover, the EPM is required to issue a letter to the student containing its "findings and decisions" and if the EPM decides to "uphold [the] removal or expulsion, the EPM shall *set forth the reasons why this punishment was appropriate*." *Id.* (emphasis added). These requirements track the APA requirement that an agency must provide an explanation for its actions.

No such explanation was given in this case. The letter issued to Mr. Iaccarino contains no reason for why his punishment, expulsion, was the appropriate sanction. There is only one sentence in the letter that is related to the discipline imposed in this case: "I have determined that I believe the alleged misconduct occurred and the discipline imposed--expulsion--was appropriate." AR at 1. This statement that "the discipline imposed--expulsion--was appropriate" is the kind of conclusory statement that this Court has repeatedly held is insufficient to explain an agency's action. *See e.g.*, *Tourous Records*, 259 F.3d at 737 ("The letter says nothing other than that the 'Affidavit of Indigency you submitted in lieu of a cost bond is not adequately supported.' That is not a statement of reasoning, but of conclusion.").

The defendants make two arguments in an attempt to salvage this deficient explanation. First, the defendants argue that PS King's Inquiry Report adequately explained the expulsion. Defs.' Mot., ECF No. 18-1 at 16–18. This argument fails because, as explained above, the Inquiry Report clearly relied on erroneous facts. *See Supra* at 21–22. The decision on appeal did not consider those facts; rather it based its finding of misconduct on facts borne out by the administrative record in explaining why the misconduct occurred. AR at 1 (explaining the facts it found persuasive in reaching its finding of misconduct).

Defendants' second argument that the record contains ample evidence to support Mr. Iaccarino's expulsion similarly misses the point. The defendants point to several FLETC rules that Mr. Iaccarino allegedly violated as a rationale for the expulsion. Defs.' Reply, ECF No. 21 at 5–7. To be sure, the agency explained its reasoning as to why the misconduct alleged was substantiated by the preponderance of the evidence. AR at 1. However, after the agency explained the basis for the finding of misconduct, it provided no reason as to *why the imposed sanction was warranted* based on that finding of misconduct. To the extent the defendants seek to fill that void with references to other violations that Mr. Iaccarino may have committed, this "court[] may not accept [the defendants'] post hoc rationalizations" as a substitute for DHS's explanation, or lack thereof. *See Remmie v.*

*Mabus*, 898 F. Supp. 2d 108, 120 (D.D.C. 2012) (stating agency's purported rationale for a final decision explained in its briefing to the Court is no substitute for the agency's actual explanation).

The agency had several options at its disposal to discipline Mr. Iaccarino for the misconduct it found had occurred. It chose expulsion, effectively ending Mr. Iaccarino's career in federal law enforcement. The Court notes it is not passing judgment on the agency's methods or forms of discipline. This Court's limited role in the administrative scheme is to determine if the agency adequately explained its decision. To fulfill its obligation under that role, "this Court must be able to ascertain the [agency's] basis for the decision." *Reeder v. James*, 121 F. Supp. 3d 1, 10 (D.D.C. 2015). DHS's scarce explanation in this case is insufficient to allow the Court to ascertain DHS's basis for its decision to expel Mr. Iaccarino. *See id.* Because DHS did not explain why expulsion was the appropriate punishment, contrary to its own procedures, its decision was arbitrary and capricious.

Mr. Iaccarino requests this Court to "order the Defendants to rescind the expulsion actions from [his] records of employment with the Defendants and issue a new final agency decision consistent with the less severe penalties issued to the other trainees" involved in the January 21, 2017 incident.

Compl., ECF No. 1 ¶ 63. However, "[w]hen an agency provides a statement of reasons insufficient to permit a court to discern its rationale, or states no reasons at all, the usual remedy is a remand to the agency for additional investigation or explanation." *Tourous Records, Inc.*, 259 F.3d at 738. Therefore, this Court remands this matter to the agency so that it may explain its reasoning for determining that expulsion is the appropriate sanction for Mr. Iaccarino's misconduct.

## IV. CONCLUSION

Accordingly, the defendants' Motion for Summary Judgment is **GRANTED IN PART** because DHS's finding of misconduct was supported by substantial evidence and **DENIED IN PART** because DHS failed to explain why expulsion was the appropriate sanction for that misconduct. Furthermore, Mr. Iaccarino's Cross-Motion for Summary Judgment is **GRANTED IN PART** because of DHS's failure to explain its reasoning for the expulsion **and DENIED IN PART** because DHS's misconduct finding was supported by substantial evidence and because the appropriate remedy is a remand to the agency rather than the relief Mr. Iaccarino requests of the Court. The Court **REMANDS** the matter to DHS for further proceedings consistent with this Memorandum Opinion. An appropriate Order accompanies this Memorandum Opinion.

SO ORDERED.

Signed:     Emmet G. Sullivan
            United States District Judge
            August 30, 2018